IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| OSPREY PARTNERS RSF LLC and<br>SVOBODA CONSULTING,<br><br>    Plaintiffs,<br><br>  v.<br><br>UBS FINANCIAL SERVICES INC. and<br>DOES 1 through 10, inclusive,<br><br>    Defendants.<br>  / | No. C 16-04894 WHA<br><br>**ORDER DENYING MOTION TO<br>COMPEL ARBITRATION** |

## INTRODUCTION

In this breach of contract action, defendants move to compel submission of plaintiff's claims to binding arbitration. Defendants' motion is **DENIED**.

## STATEMENT

Plaintiffs Osprey Partners RSF LLC and Svoboda Consulting are recruiting businesses founded and owned by Milton Barnes and William Svoboda, respectively. Defendant UBS Financial Services Inc. is a national business offering wealth management and related services (Dkt. Nos. 10 at 1, 12 at 2). The gravamen of this action is that UBS hired plaintiffs to recruit four new hires from another company, and then failed to pay plaintiffs their allegedly agreed-upon compensation as to three of the four.

In 2013, Barnes contacted Steve McCashin, executive director of UBS, regarding the possibility of UBS hiring Chris Laver, who was then a financial advisor at Credit Suisse. McCashin allegedly sent Barnes a text message that stated, "You are covered if I hire [Laver]." In December 2013, William Svoboda independently contacted McCashin regarding the

possibility of UBS hiring Geir Fjugstad, another financial advisor at Credit Suisse. Fjugstad, along with Stephen Andres and Alan Shanken, were members of Laver's team (Dkt. Nos. 10 at 1, 12 at 2). In May 2014, after these parallel recruitments efforts came to light, the following conversation allegedly took place via text messages between Barnes and McCashin:

> Barnes: "just spoke w/ [C]hris Laver...Interesting call...[P]lease keep me covered. Can discuss when you return."
>
> McCashin: "That one is tough. Met with his partner [Fjugstad] multiple times. Set up by [William Svoboda]."
>
> Barnes: "I can be of assistance...[Laver] takes my calls..."
>
> McCashin: "I'm open to split etc. [J]ust being clear that I had an intro to [Fjugstad]."
>
> Barnes: "[s]plit is [always] fine..."

Shortly thereafter, Barnes texted McCashin, "[L]aver situation may now change...Bill Svoboda and I are now a team." McCashin replied, "Fine" (Dkt. Nos. 1 Exh. 2 at 4, 10 at 2, 12 at 2–3).

From December 2015 to January 2016, all four members of Laver's team joined UBS. On December 17, Barnes emailed McCashin and asked in relevant part, "When you have a minute can we go over the process for invoicing and the new contract for Fgustaad [*sic*] and Andres?" McCashin replied (Dkt. No. 12-1 Exh. 1):

> I had a call RE the Fjugstad situation and your contracts yesterday. ¶ A final decision on exact parameters has not been determined, and Andres as of today has not joined. ¶ Mariel will reach out to you regarding a new contract. ¶ Terms will be 4% on Brookfield/Zhong per the previous and standard one-off contract. ¶ 6% on Fjugstad et al [*sic*] as it pushes the total over 5mm. ¶ Recruiting has the final say on that, not me.[1]

On December 21, Mariel Izquierdo from UBS emailed Barnes "one time agreements for the recently placed Zhong/Brookfield team and Geir Fjugstad" and asked that he "review, sign and scan the whole contract back to [her] attention."

The "Financial Advisor Recruiting Agreement" for Fjugstad ("Fjugstad Agreement") is the focal point of this case. According to Barnes's email, he executed and returned the agreements about an hour later (Dkt. Nos. 10 at 2, 12 at 4, 12-1 Exh. 2). His signature on the

---

[1] "Brookfield/Zhong" referred to another team of financial advisors that Barnes recruited to UBS from Credit Suisse around the same time (Dkt. No. 12 at 4).

2

Fjugstad Agreement, however, was dated December 1, 2015. Izquierdo's signature was dated December 12, 2015. The third and final signature of Patricia Cashin, executive director of business acquisition at UBS, was dated December 22, 2015 (Dkt. No. 10-1 Exh. 1 at 10).

The parties do not dispute that UBS paid plaintiffs for recruiting Fjugstad pursuant to the Fjugstad Agreement (Dkt. No. 12 at 5). UBS did not, however, pay plaintiffs for recruiting the other three members of Laver's team. Plaintiffs then filed a complaint in state court alleging causes of action for breach of contract and quantum meruit. Specifically, plaintiffs alleged they had a "partially written, partially oral and partially implied" contract with UBS, pursuant to which, in exchange for recruiting Laver's team, plaintiffs were to "receive payment . . . in the amount of a commission fee of 6% of the trailing 12 month of team production" (Dkt. No. 1 at 17–18). UBS removed the action to federal court and now moves to compel arbitration based on the Fjugstad Agreement, which provided in relevant part (Dkt. 10-1 Exh. 1 at 9):

> With the exception of claims for injunctive relief, [Osprey] and [UBS] agree that, unless prohibited by applicable law, all disputes or claims arising out of or relating to this Agreement will be determined by arbitration as authorized and governed by the arbitration law of the state of New Jersey. Any such arbitration will be conducted under the auspices and rules of JAMS.

**ANALYSIS**

**1.   APPLICABLE LAW.**

As a preliminary matter, neither side directly addresses the applicable law in their briefs. UBS claims the Federal Arbitration Act should govern, but then adds that both California and New Jersey law favor arbitration as a policy matter (Dkt. No. 10 at 5–6). Plaintiffs, on the other hand, do not even articulate an applicable legal framework, although their repeated citations to California statutes and case law suggest they believe California law should apply (Dkt. No. 12 at 5–10). Importantly, the instant motion is not about the *enforceability* of the arbitration clause in the Fjugstad Agreement. Plaintiffs do not dispute that the arbitration clause would be enforceable *if* it applied to their recruitments of Laver, Andres, and Shanken. But since the Fjugstad Agreement did not encompass those three recruitments, plaintiffs contend, there is no reason to compel arbitration of claims for relief arising out of those recruitments.

3

Plaintiffs claim their recruitments of Laver, Andres, and Shanken were governed instead by a "partially written, partially oral and partially implied" contract with UBS that was formed over the course of multiple exchanges between Barnes and McCashin. During oral argument, the Court asked if plaintiffs in any way relied, or intend at some point to rely, on the Fjugstad Agreement as the written part of this alleged contract that forms the basis for their claims for relief. Plaintiffs forswore any such reliance. According to plaintiffs, the essential term of the "partially written, partially oral and partially implied" contract was that plaintiffs would receive a commission fee in exchange for recruiting all four members of Laver's team (Dkt. No. 1 Exh. 2 at 5–6). UBS, on the other hand, claims the Fjugstad Agreement was "a derivative of the overarching agreement to recruit [Laver's team]," and thus "necessarily . . . part of . . . Plaintiffs' alleged 'partially written, partially oral and partially implied' contract with UBS" (Dkt. No. 10 at 7). In other words, the parties agree for purposes of this motion that *some* agreement with multiple components encompassed the recruitment of Laver's team. They disagree, however, as to whether the Fjugstad Agreement governed this broader agreement so that the former's arbitration clause applied, not only to claims arising out of Fjugstad's recruitment, but also to claims arising out of the recruitments of the other team members.

This is essentially a contract dispute that must be resolved under customary principles of contract law. The parties have not briefed, and this order makes no determination as to, which body of law should govern the entire alleged "partially written, partially oral and partially implied" contract between plaintiffs and UBS. For purposes of this motion it is sufficient to determine whether the written Fjugstad Agreement should be construed to encompass all four recruitments of Laver's team members. This order therefore looks to the Fjugstad Agreement's express terms to determine the governing law for purposes of this inquiry. The Fjugstad Agreement's governing law provision stated, "This Agreement shall be governed by and construed and enforced in accordance with the laws of the state of New Jersey without regard to principles of conflicts of laws" (Dkt. No. 10-1 Exh. 1 at 9). This order thus applies New Jersey contract law to determine whether the Fjugstad Agreement and its arbitration clause governed plaintiffs' recruitment of all four members of Laver's team.

4

**2.     APPLICABILITY OF THE FJUGSTAD AGREEMENT.**

An agreement to arbitrate, like any other contract, must be the product of mutual assent as determined under customary principles of contract law. *Atalese v. U.S. Legal Servs. Grp., L.P.*, 99 A.3d 306, 442 (N.J. 2014). "A legally enforceable agreement requires 'a meeting of the minds,'" and "[p]arties are not required 'to arbitrate when they have not agreed to do so.'" *Ibid.* (citing *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Jr. Univ.*, 489 U.S. 468, 478 (1989)). As the party seeking to enforce an alleged contractual provision to arbitrate, UBS has the burden to prove, by a preponderance of the evidence, that plaintiffs assented to that provision. *Midland Funding LLC v. Bordeaux*, 2016 WL 5417837, at *3 (N.J. Super. Ct. App. Div. Sept. 29, 2016). "Moreover, because the arbitration clause constitutes a waiver of [plaintiffs'] constitutional right to adjudicate this dispute in a court of law, [UBS] must prove that [plaintiffs] had full knowledge of [their] legal rights and intended to surrender those rights." *Ibid.* UBS has not met this burden of proof.

The Fjugstad Agreement, by its express terms, does not mention plaintiffs' recruitment of Laver, Andres, or Shanken. Nor is there any evidence in the record that either plaintiffs or USB contemplated, much less agreed to, the Fjugstad Agreement encompassing multiple recruitments. In fact, the record indicates UBS took a piecemeal approach to entering recruitment contracts and committed to specific contract terms only *after* recruitment had been successfully completed. For example, McCashin's December 17 email to Barnes specifically mentioned "Andres as of today has not joined," and went on to identify new contract terms offered only for recruitments that had been successful up to that point, *i.e.*, Brookfield/Zhong and Fjugstad. Even as to those contracts, McCashin added the disclaimer that "Recruiting has the final say on [the contract terms]." In other words, although UBS and plaintiffs had discussed and worked towards the recruitment of Laver's team since 2013 or 2014, UBS did not commit to concrete contract terms for Fjugstad's recruitment until that specific recruitment was actually successful (Dkt. No. 12-1 Exhs. 1–2). At the same time, UBS did not commit to concrete contract terms for Andres's recruitment contemporaneously with the Fjugstad Agreement because the former had not yet been completed.

5

Indeed, the record at this stage suggests UBS specifically parsed out "one-off" contracts for each successful recruitment *apart from* other ongoing but not yet successful recruitments, even when multiple recruitments were contemplated by both sides as part of an ongoing effort to recruit an entire team. For example, Izquierdo's December 21 email to Barnes echoed McCashin's language that the Fjugstad Agreement was a "one time agreement[]" (Dkt. No. 12-1 Exhs. 1–2). This record does not support construing the Fjugstad Agreement to encompass any recruitments beyond that of Fjugstad himself. The case is even weaker for finding that Osprey, through Barnes, waived its rights as to all other recruitments of Laver's team members by assenting to an arbitration provision articulated only in the Fjugstad Agreement. Nothing in the record or the Fjugstad Agreement itself could reasonably suggest the arbitration clause would function in such an anomalous way.

UBS explains at length that the FAA "establishes a national policy favoring arbitration *when* the parties contract for that form of dispute resolution," and that both California and New Jersey law favor arbitration as a policy matter (Dkt. No. 10 at 5–6) (emphasis added). This argument, however, is unresponsive to the question of whether the parties in this case actually contracted to arbitrate. UBS assumes as a premise the very fact challenged by plaintiffs, *i.e.*, that the Fjugstad Agreement and its arbitration clause applied to plaintiffs' recruitment of the rest of Laver's team. If the Fjugstad Agreement did not apply to the recruitments of Laver, Andres, and Shanken, then UBS's arguments about policy favoring arbitration are beside the point. The FAA policy UBS invokes favors arbitration already agreed upon by the parties but does not independently establish that the parties agreed to arbitrate in the first place.

UBS argues "Plaintiffs' allegations regarding a written/oral/implied agreement providing for payment for the recruitment of all four team members must necessarily include the writing that provided for payment relating to one (Fjugstad) of the four" (Dkt. No. 10 at 8). True as to the one, but it does not then follow that the Fjugstad Agreement, which "provided for payment relating to one" team member, necessarily governed "the recruitment of all four team members." UBS attempts to bridge this gap by citing *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 721 (9th Cir. 1999), for the proposition that "[a] broad arbitration clause reaches every

6

dispute between the parties having a significant relationship to the contract and all disputes having their origin or genesis in the contract, and its application requires only that the factual allegations touch matters covered by the contract" (quotations omitted) (Dkt. No. 10 at 8).

The principle articulated in *Simula*, however, means only that the arbitration clause in the Fjugstad Agreement should be interpreted broadly with respect to claims that "have a significant relationship to" or "touch matters covered by" *the Fjugstad Agreement itself*. Nothing in *Simula*, or any other case cited by UBS, compels a finding that the Fjugstad Agreement's arbitration clause should be construed to encompass claims that do not rely on or challenge the Fjugstad Agreement or its underlying transaction, *i.e.*, Fjugstad's recruitment. Specifically, plaintiffs' claims for relief relate only to the recruitments of Laver, Andres, and Shanken — none of which are "matters covered by" the Fjugstad Agreement. There is thus no conclusive reason to find the Fjugstad Agreement, contrary to its express terms, was intended to govern recruitments other than Fjugstad's. Moreover, UBS's position would compel the conclusion that every transaction, no matter how complex, is subject to arbitration as long as some small, isolated part of the transaction involved an agreement that contained an arbitration clause. This position is untenable, and accordingly rejected.

UBS enjoyed a strong bargaining position to extract a waiver of normal litigation rights and could, most likely, easily have done so. But it should have actually extracted that waiver instead of leaving it to chance. This order concludes the Fjugstad Agreement and its arbitration clause did not extend to encompass claims for relief arising out of recruitments other than Fjugstad's. The Fjugstad Agreement thus does not support UBS's motion to compel arbitration of plaintiffs' claims relating to the recruitments of Laver, Andres, and Shanken.

**3.     ENFORCEMENT AGAINST SVOBODA CONSULTING.**

UBS contends Svoboda Consulting should be bound by the arbitration clause in the Fjugstad Agreement even though it was not a signatory thereto, for three reasons. *First*, UBS claims that, "[i]n light of Plaintiffs' communication to McCashin that Osprey Partners intended to share with Svoboda [Consulting] the profits of any agreement for the recruitment member of the Team, Svoboda [Consulting] is clearly a third party beneficiary of the Fjugstad Agreement"

7

(Dkt. No. 10 at 11–12). Thus, UBS argues, the Fjugstad Agreement's arbitration clause should apply with equal force to both Osprey and Svoboda Consulting. This argument assumes, however, that the arbitration clause applies in the first place to Osprey's claims for relief. Since this order concludes the arbitration clause did not encompass plaintiffs' claims arising out of their recruitment of individuals other than Fjugstad, UBS's argument is unavailing regardless of whether Svoboda Consulting was a third party beneficiary of the Fjugstad Agreement.

*Second*, UBS claims a "preexisting relationship" between Osprey and Svoboda Consulting gave the former the power to bind the latter contractually (*id.* at 12–13). Again, this argument assumes the Fjugstad Agreement and its arbitration clause are binding on Osprey in the instant action. As stated, that is not the case. The Fjugstad Agreement and its arbitration clause do not apply to Osprey's claims for relief here. Thus, even if Osprey had the power to bind Svoboda Consulting to the Fjugstad Agreement, that would not compel arbitration of Svoboda Consulting's claims for relief in this case.

*Third*, UBS argues Svoboda Consulting should be equitably estopped from "repudiating the [Fjugstad Agreement's] arbitration clause" because Svoboda Consulting is suing "on the basis that, even though [it] was not a party to the contract, [it] is nonetheless entitled to recover for its breach" (*id.* at 13). As explained, however, plaintiffs are asserting a right to recovery under a "partially written, partially oral and partially implied" contract with UBS that is *separate from* the Fjugstad Agreement. The former covered plaintiffs' recruitments of Laver, Andres, and Shanken, while the latter covered only Fjugstad. Thus, the fact that Svoboda Consulting is suing based on the former does not equitably estop it from challenging the attempted improper application of an arbitration clause in the latter.

## CONCLUSION

For the foregoing reasons, UBS's motion to compel arbitration is **DENIED.**

**IT IS SO ORDERED.**

Dated: November 14, 2016.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE